**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALEXANDRA PELLETIER, JOAN PADDEN, and M. SAMANTHA PAK, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | Civil Action No.: |
| v. | |
| PEARSON EDUCATION, INC.; CENGAGE LEARNING, INC.; MCGRAW-HILL GLOBAL EDUCATION HOLDINGS, LLC; EDUCATIONAL PUBLISHERS ENFORCEMENT GROUP; BARNES & NOBLE EDUCATION, INC.; BARNES & NOBLE COLLEGE BOOKSELLERS, LLC; and FOLLETT HIGHER EDUCATION GROUP, | **CLASS ACTION COMPLAINT** |
| Defendants. | **JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   JURISDICTION AND VENUE ........................................................................6

III.  THE PARTIES.....................................................................................................6

IV.   INTERSTATE COMMERCE ............................................................................8

V.    FACTUAL ALLEGATIONS .............................................................................9

     A.    Market Overview ..................................................................................9

     B.    Pre-Conspiracy Course Materials Market.......................................10

     C.    EPEG and Development of Inclusive Access ...................................12

     D.    The Implementation of Inclusive Access...........................................13

     E.    Agreements Among Defendants to Implement Inclusive Access.....................15

     F.    Defendants' Conduct Has Harmed Competition, Resulted in Supra-
        Competitive Prices and Has No Pro-Competitive Justification .........................17

     G.    Continuing Violation ...........................................................................18

     H.    The Recent Investigation Revealed the Highly Concentrated Nature
        of the Industry xx ...............................................................................19

VI.   RELEVANT MARKET.....................................................................................20

VII.  CLASS ACTION ALLEGATIONS ................................................................23

VIII. ANTITRUST INJURY .....................................................................................26

IX.   FRAUDULENT CONCEALMENT................................................................27

X.    CLAIMS FOR RELIEF ...................................................................................28

XI.   PRAYER FOR RELIEF ...................................................................................34

JURY DEMANDED...................................................................................................36

College students Alexandra Pelletier, Joan Padden, and M. Samantha Pak ("Plaintiffs") bring this antitrust action, by and through their attorneys, under Sections 1 and 2 of the Sherman Act, Sections 4 and 16 of the Clayton Act, and Rule 23 of the Federal Rules of Civil Procedure, for treble damages, injunctive relief, and such other relief as may be determined as just and proper, on behalf of themselves and all others similarly situated against: (1) the dominant publishers of textbooks and other Course Materials[1] used at Colleges[2] – Defendants McGraw Hill, LLC (f/k/a McGrawHill Global Education Holdings, LLC) ("McGraw" or "McGraw-Hill"), Pearson Education, Inc. ("Pearson") and Cengage Learning, Inc. ("Cengage"); (2) the key textbook publishing industry trade group – Defendant Educational Publishers Enforcement Group ("EPEG"); and (3) the dominant retailers operating on-campus College bookstores – Defendants Barnes & Noble Education, Inc. and Barnes & Noble College Booksellers, LLC (collectively, "Barnes & Noble"), and Follett Higher Education Group, Inc. ("Follett").[3] Plaintiffs allege that they paid supra-competitive prices for Course Materials as a result of Defendants' "Inclusive Access" scheme described herein and in support thereof, allege as follows:

## I.     INTRODUCTION

1.      At the beginning of every semester at Colleges across the country, students go through the process of determining what Course Materials are required for each of their classes. The required Course Materials are selected and/or specified by the professors teaching the classes and the students who take the classes have no control over their selection.  Because of this, the

---

[1] As used herein, "Course Materials" includes textbooks and related course materials such as workbooks, homework, quizzes, tests, etc., in whatever form (e.g., print, electronic, digital, etc.).

[2] The term "Colleges" is used in this Complaint to refer to all institutes of higher education including two-year community or junior colleges, four-year colleges and four-year universities.

[3] McGraw-Hill, Pearson and Cengage are collectively referred to herein as the "Publisher Defendants." Barnes & Noble and Follet are collectively referred to herein as the "Retailer Defendants." The Publisher Defendants, the Retailer Defendants and EPEG are collectively referred to herein as "Defendants."

students represent a captive market for the designated Course Materials. However, what has historically been within each student's control are decisions related to obtaining those materials – where to buy them, whether to buy them new or used, or whether to buy them at all.

2.      The market for Course Materials is large and lucrative. One industry analysis put the size of the industry as of 2014 at nearly $10 billion, with about $6 billion of that focused on textbook publishers. The Publisher Defendants are the dominant publishers of college textbooks in the country. The Publisher Defendants represent at least 80 percent of the market for Course Materials. The Retailer Defendants are the dominant operators of official (i.e., institutionally-licensed) on-campus bookstores, operating approximately 57 percent of on-campus bookstores throughout the United States.

3.      Publishers, including the Publisher Defendants, have struggled for years to protect their sales from outside threats such as used books. Over the years, publishers have implemented various strategies to mitigate these competitive threats including such things as printing new versions of textbooks on a yearly basis that contain only minor revisions, or creating custom publications that are also updated annually or contain elements such as workbooks that are not easily reusable. As a result of the captive market structure and the Publishers' efforts to limit competition, textbook prices skyrocketed from the mid-1970's through the early 2010's.

4.      As the digital economy expanded, students were initially given more opportunities to exercise free choice and purchase Course Materials, in either new or used form, and from alternate sources that were not affiliated with the Defendants including, for example, non-Defendant retailers such as eBay, Amazon, and Chegg. Even with the introduction of electronic textbooks and other Course Materials, these same sources offered additional choices for students. In addition, some students chose not to buy some Course Materials at all, either choosing to borrow

those materials from other students, or to forego owning the materials altogether. Beginning sometime around 2008, some companies began offering students the option to rent Course Materials, posing a substantial threat to Defendants' Course Materials sales.

5.     The mainstreaming of Course Material rentals, along with the increase in used Course Material sales, created tremendous competitive pressure on the industry. As a result of all of these pressures, Defendants' sales of Course Materials began to drop and the prices Defendants could charge for those materials began to stagnate. This, in turn, directly impacted on the revenue and profits of both the Publisher Defendants and the Retailer Defendants.

6.     To combat these market dynamics, the Defendants conspired to, and did in fact, restrain trade in the market for Course Materials by developing a program called "Inclusive Access" which they implemented through agreements among themselves and by creating and implementing a variety of "Inclusive Access" agreements with numerous Colleges.[4]

7.     Inclusive Access is a method of providing Course Materials to students where students, like Plaintiffs and Class Members, pay for a code that gives them electronic access to the Publisher Defendants' digital Course Materials which typically include textbooks, workbooks, homework, quizzes, tests, etc. ("Inclusive Access Materials"). The Inclusive Access Materials typically include some Course Materials such as reading assignments and homework that are needed to pass the course and are only available through Inclusive Access.  The students' ability to access the Inclusive Access Materials expires at the end of the semester or a defined period of time.

---

[4] Different publishers and Colleges use different names for these "Inclusive Access" programs including, but not limited to "inclusive access," "innovative pricing," "immediate access," and "first day." However, the programs all have similar attributes and are referred to collectively herein as "Inclusive Access."

8.      For classes where "Inclusive Access" applies, Plaintiffs and Class Members are required to purchase, each semester or other time limited period, new, digital copies of the assigned Course Materials from the Publisher Defendants or the Defendant Retailers (or both).  Students cannot obtain the mandated Course Materials from alternative sources, nor can they purchase used versions of the Course Materials or borrow them from a friend.  Instead, the students are forced to purchase the Inclusive Access Materials from the Defendants. The Retailer Defendants actively participated in the conspiracy and shared the Publisher Defendants' conspiratorial motive to boost their profits by eliminating competition and maintaining and raising prices for Inclusive Access Materials.

9.      The success of Defendants' scheme relied on the Inclusive Access agreements themselves, which incentivized Colleges to enforce a *de facto* requirement that Plaintiffs and Class Members purchase "access codes" for Inclusive Access Materials only from the Publisher Defendants and/or the Retailer Defendants, through a proprietary platform. Maximizing institutional support was also critical to Defendants' scheme because a federal law requires any College offering courses using digital access programs such as Inclusive Access to allow students enrolled in those classes to "opt out" of any such program and obtain their books and suppliers from whatever source, and in whatever format, the students choose.

10.     However, Defendants intentionally designed their products and offerings, and implemented policies, to make the opt-out process difficult or untenable. For example, the Inclusive Access Materials include, among other things, homework and quizzes that are not otherwise available. Therefore, if a student "opted-out" of Inclusive Access, they would be unable to complete that portion of the coursework and in situations where the homework represents a set

percentage of that student's overall grade (e.g., 20 percent), the student would be effectively agreeing to a zero for that portion of their overall grade by opting-out.

11.     Another method of reinforcing the conspiracy involved restricting how Plaintiffs and Class Members purchased Inclusive Access Materials.  Defendant Publishers intentionally limited how students taking Inclusive Access courses could purchase the "access codes" for a given course.  Students could either directly pay the Publisher Defendants for the Inclusive Access "access codes" for a given course, or they could purchase access codes directly from an official on-campus bookstore, which, more often than not, was run by one of the Retailer Defendants. In addition, in some circumstances, the Defendants worked with the Colleges so that the fee for the Inclusive Access Materials was charged by the College itself, with the charge being added directly to the student's account immediately upon expiration of the "add/drop" period for the course. Some Colleges automatically added charges for the Inclusive Access codes to the student's overall College fees.

12.     Defendants collectively promoted and implemented Inclusive Access for the specific purpose of destroying competition, limiting supply, and controlling and raising prices for Inclusive Access Materials. Defendants were able to implement their conspiracy as a result of their market dominance and through their ability to easily meet and collude through trade associations and at industry events, and through their joint promotion of Inclusive Access to Colleges. Rather than competing and taking market share from one another, Defendants worked toward a common goal of monopolizing the market, which has allowed them to charge students higher prices for Course Materials with no procompetitive justifications for their collusive conduct.

13.     Defendants' conspiracy has suppressed competition, reduced student-consumer choice, and raised prices for course materials, resulting in antitrust injury to Plaintiffs and the

proposed Class in the form of overcharge damages. The conduct at issue here began no later than January 1, 2016 and continues into the present (the "Class Period").

## II.   JURISDICTION AND VENUE

14.     Plaintiffs brings claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15. Plaintiffs also brings claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain injunctive relief and to recover the costs of suit, including reasonable attorneys' fees, for the injuries sustained by Plaintiffs and all others similarly situated.

15.     This Court has subject matter jurisdiction over these claims under Section 16 of the Clayton Act, 15 U.S.C. § 26, as well as under 28 U.S.C. §§ 1331, 1337.

16.     This Court has personal jurisdiction over each Defendant on several grounds: (1) Defendants Pearson and Barnes & Noble have their principal places of business in, and transact substantial business in New Jersey, (2) Defendants Cengage, McGraw, and Follett all transact substantial business in New Jersey, and (3) Defendants Cengage, McGraw, and Follett herein all conspired with New Jersey-based Defendants Pearson and B&N, and (4) Defendants committed acts in furtherance of the conspiracy in New Jersey.

17.     Venue is proper in this District because Defendants Pearson and Barnes & Noble have their corporate headquarters in this District and because all of the Defendants transact a substantial amount of business in this District, conspired to exclude and restrain competition in this District, and continue to affect a substantial amount of trade and commerce in this District.

## III.   THE PARTIES

18.     Plaintiff Alexandra Pelletier is a resident of Wanaque, New Jersey. During the Class Period, Ms. Pelletier has been, and continues to be, a College student taking higher education

6

courses where she is required to purchase Course Materials, including Inclusive Access Materials, and did, in fact, purchase those materials directly from one or more of the Defendants.

19.     Plaintiff Joan Padden is a resident of Blue Bell, Pennsylvania. During the Class Period, Ms. Padden has been, and continues to be, a College student taking higher education courses where she was required to purchase Course Materials including Inclusive Access Materials, and did, in fact, purchase those materials directly from one or more of the Defendants.

20.     Plaintiff M. Samantha Pak is a resident of Ambler, Pennsylvania. During the Class Period, Ms. Pak has been, and continues to be, a College student taking higher education courses where she was required to purchase Course Materials including Inclusive Access Materials, and did, in fact, purchase those materials directly from one or more of the Defendants.

21.     Defendant McGraw-Hill Global Education Holdings is a Delaware LLC based in New York, NY that publishes college textbooks and Course Materials, including Inclusive Access Materials.

22.     Defendant Pearson Education, Inc. is a Delaware corporation based in Upper Saddle River, NJ that publishes college textbooks and Course Materials, including Inclusive Access Materials.

23.     Defendant Cengage Learning, Inc. is a Delaware corporation based in Boston, MA that publishes college textbooks and Course Materials, including Inclusive Access Materials.

24.     Defendant Educational Publishers Enforcement Group ("EPEG") is an entity created, financed and operated by the Publisher Defendants throughout the entire Class Period, and may be served with summons pursuant to Federal Rule of Civil Procedure 4 through its members, the Publisher Defendants.   EPEG provided the Publisher Defendants with the opportunities and means to create, implement and maintain the conspiracy alleged herein. As

detailed below, this included the development and "enforcement" of so-called Anti-Counterfeit Best Practices (the "EPEG Guidelines"), which the Publisher Defendants claim are for the purpose of eliminating counterfeit textbooks in the marketplace.  In actuality, the EPEG Guidelines are a pretext Defendants used to control who can buy and resell the Publisher Defendants' Course Materials, further cementing the Publisher Defendants' collusive efforts to reduce the supply and access to, and raise prices for, Course Materials, including Inclusive Access Materials.

25.     Defendant Barnes & Noble Education, Inc., the parent company of defendant Barnes & Noble College Booksellers, LLC., is a Delaware corporation based in Basking Ridge, NJ that was spun off from Barnes & Noble, Inc. in 2015.

26.     Defendant Barnes & Noble College Booksellers, LLC is a Delaware LLC based in Basking Ridge, NJ that operates Barnes & Noble campus bookstores nationwide and sells Course Materials, including Inclusive Access Materials, through those bookstores.

27.     Defendant Follett Higher Education Group is an Illinois corporation based in Westchester, IL that operates Follett's campus bookstores nationwide and sells Course Materials, including Inclusive Access Materials, through those bookstores.

## IV.     INTERSTATE COMMERCE

28.     Defendants' actions have had a significant effect on interstate commerce in the Course Materials industry nationwide.

29.     The Publisher Defendants – Cengage, McGraw, and Pearson – each sell Course Materials, including Inclusive Access Materials, to students (including Plaintiffs and Class Members) in all 50 states and the District of Columbia.

30.     Defendant Barnes & Noble has on-campus college bookstores in 43 states. On information and belief, Barnes & Noble sells Course Materials including Inclusive Access Materials to students such as Plaintiffs and Class Members in all 43 of those states.

31.     Defendant Follett has on-campus college bookstores in 48 states. On information and belief, Follett sells Course Materials including Inclusive Access Materials to students such as Plaintiffs and Class Members in all 48 of those states.

32.     The conspiracy herein had a substantial effect on the national market for Course Materials including Inclusive Access materials.

### V.     FACTUAL ALLEGATIONS

33.     Plaintiffs incorporates by reference, as if fully set forth herein, the previous allegations contained in this complaint. Plaintiffs further allege the following.

**A.     Market Overview.**

34.     Publishers, including the Publisher Defendants, produce Course Materials and are competitors or potential competitors of one another. Historically, there were numerous publishers of Course Materials but after market consolidation beginning in the 1990s the largest five publishers ended up with somewhat over 80 percent of industry sales. More recently, the three largest publishers of Course Materials in the United States, the Publisher Defendants, controlled in excess of 80 percent of U.S. Course Materials sales.

35.     In May of 2019, Cengage and McGraw-Hill announced a planned merger that would have further concentrated the industry by combining the second and third-largest publishers of Course Materials into an entity with reportedly a combined 45 percent market share.  Defendant Pearson controls approximately 40 percent of the course materials market. The proposed merger, which would have created an effective duopoly, was highly contested by public interest groups,

student groups, and student governments. A letter from six U.S. Senators to the Department of Justice expressed concern over the proposed merger in view of rising textbook costs, noting "the highly consolidated nature of the textbook industry," which is "overwhelmingly dominated by a small number of companies." Eventually, under pressure from the Department of Justice and the competition authority in the United Kingdom, the parties abandoned the merger.

36.     Publishers sell Course Materials themselves directly and also through retailers, including the Retailer Defendants.  Some Colleges operate their own on-campus bookstores but those that do not outsource the running of their on-campus bookstores to a separate retailer, which typically signs a lease and pays for the right to operate the College's on-campus bookstore.

37.     The Retailer Defendants are the largest retailers in the market for Course Materials. They currently control an estimated 57 percent of the lease-operated College on-campus bookstores (which represents an estimated 64 percent of College students). The Retailer Defendants, in recent years, have significantly increased the amount they are willing to pay to become the lease-operated retailer at a College.  Because of the profitability of these opportunities, the Retailer Defendants now often pay millions of dollars to obtain even one on-campus location. The Retailer Defendants often have direct access to the College's computer systems giving them the ability to directly access a student's accounts so that they can take federal financial aid as payment for purchases of Course Materials.

38.     Independent retailers, including both online sellers and brick-and-mortar stores, compete with the Retailer Defendants to sell (and rent) Course Materials to College students.

**B.      Pre-Conspiracy Course Materials Market.**

39.     Historically, students bought new or used printed Course Materials from on-campus or off-campus bookstores, or they bought used Course Materials from friends or other

students. Originally Course Materials were limited to printed textbooks; over time Course Materials included printed textbooks and additional materials for students' course work such as workbooks, homework and quizzes; and ultimately Course Materials grew to include digital Course Materials which served as alternatives to traditional, printed Course Materials.

40.      Originally, various retailers engaged in full and open competition for student purchases of Course Materials. Colleges, primarily faculty members, selected course materials; publishers made such course materials available to all retailers at the same price and under similar terms; and students could then search for the best price. Students bought Course Materials from on-campus and off-campus retailers and other students. Some students even chose not to buy some of the Course Materials at all.

41.      There was also a thriving secondary market for Course Materials where students who purchased printed Course Materials could resell those materials (thereby recouping some of their original costs) to other students or sell them back to retailers who then, in turn, resold them to students at significantly reduced prices (creating opportunities for students to purchase cheaper used Course Materials). From 1997 to 2007, College bookstores reportedly sold used books at an average of just under 75 percent of new textbook prices.

42.      As the prominence of online selling grew, students were provided with even more options, traditional brick-and-mortar retailers – *e.g*., on-campus and off-campus bookstores – were forced to compete with online retailers including Amazon, e-bay, Craigslist, Chegg, and others. As digital Course Materials developed, students could still buy them from these online sources and other retailers. To buy those Course Materials, students often purchases access codes (or unique serial numbers) that they could then use to unlock the digital Course Materials. In addition, with

the advent of digital Course Materials and the prevalence of online retailers, students eventually were able to rent Course Materials.

43.     As students moved to online purchasing or renting, they were able to rely on an assigned textbook's "International Standard Book Number" ("ISBN") – a unique product identifier used by publishers and others in the bookselling supply chain which identifies the registrant as well as the specific title, edition and format of each book – to ensure they were buying the correct Course Materials and locate those materials at the most competitive prices.

44.     All of these developments led to checks on the previously escalating prices of Course Materials. As a result, student spending on Course Materials began to decline and the Publisher Defendants and Retailer Defendants began to face declining sales, revenue and profits.

45.     At each step of the way, publishers sought ways to reduce competition. These efforts included, among other things, updating textbooks annually with small to meaningless changes or marketing "custom books" which were also updated annually with minimal alterations. Publishers would obtain unique ISBNs for these minimally altered books, create "one time" access codes, and/or add sales terms forbidding resale. The purpose of the custom books and related Course Materials was to hinder students from obtaining used or second-hand Course Materials.

46.     Initially, independent bookstores and other retailers could still obtain access to the same "custom book" Course Materials from the Publishers at the same cost as on-campus retailers, including the Retailer Defendants. Therefore, although the used market for Course Materials was hindered, retail competition still existed for the purchase and renting of new Course Materials and independent or on-line booksellers could still compete with on-campus booksellers by offering better prices, sales terms, or rental selections, thereby maintaining other shopping options for students.

C.      **EPEG and Development of Inclusive Access.**

47.     In 2016, the Publisher Defendants formed EPEG with the stated purpose of fighting textbook counterfeiting.  However, EPEG's actual purpose was to give the Publisher Defendants the opportunity to communicate with one another regarding stagnating and/or declining prices for Course Materials and to facilitate their collusive efforts to impose pretextual anti-counterfeiting policies that helped restrict competition for Course Materials.  All three Publisher Defendants are EPEG members and have been since its inception.

48.     The Publisher Defendants and EPEG developed the EPEG Guidelines, that, in effect, limit which retailers are permitted to sell Course Materials, thereby helping the Publisher Defendants to control the market and to charge higher prices by arbitrarily designating off-campus and online booksellers, who primarily sell used books, to be in violation of, or not compliant with, EPEG Guidelines.

49.     EPEG created a "white list" of acceptable retailers, and encouraged its membership to refuse to sell to anyone not on the white list, as a way of reducing competition from off-campus and online sellers, whose absence from the white list was meant to show that they were allegedly engaged in counterfeiting when, in actuality, they were only competing.   EPEG actively participated in, and facilitated, the Publisher Defendants' collusive implementation of a new program: "Inclusive Access." EPEG allowed the Publisher Defendants to enforce the terms of Inclusive Access pursuant to their conspiracy to raise and maintain prices for the Inclusive Access Course Materials, and eliminate competition from off-campus and online retailers.

D.      **The Implementation of Inclusive Access.**

50.     Inclusive Access is a method of providing Course Materials to students where students, like Plaintiffs and Class Members, pay for a code that gives them electronic access to the

13

Publisher Defendants' digital textbook and other digital Course Materials.  The Inclusive Access Materials typically include Course Materials such as reading assignments and homework that are needed to pass the course and are not available except through Inclusive Access.  Access to Inclusive Access Materials expires at the end of the semester or a defined period of time.

51.    The Inclusive Access Materials can only be obtained directly from Publisher Defendants or directly from an on-campus bookstore, often operated by a Retailer Defendant. Students are typically unable to buy the Inclusive Access Materials from any other sources because the Publisher Defendants refuse to make them available to off-campus bookstores or online sellers. Thus, students are effectively required to buy the Inclusive Access Materials from the Publisher Defendants or Retailer Defendants to pass the class, and while federal law gives them the right to opt-out of buying Inclusive Access Materials, Defendants' conspiracy ensured that any student opting out of buying Inclusive Access Materials risks getting a worse grade in the course because he or she would be unable to complete necessary assignments and homework.

52.    For Inclusive Access, there is no choice of format or delivery method. Instead, the delivery method and format are purposefully and artificially restricted as follows: Through Inclusive Access, students are provided with time-limited access (typically a single semester) to the Publishers' online materials, which can be "turned on" for the student's account, either by the Publisher or sometimes directly by the Retailer Defendants. The Inclusive Access Materials could be offered in other formats and made available through other outlets but for the unlawful and anticompetitive conduct of the Defendants.

53.    When enrolled in classes that require Inclusive Access Materials, a student will sometimes pay the Publisher Defendants or Retailer Defendants directly for the materials. Other times, a "course fee" is automatically added to the student's tuition bill to pay the Publisher

Defendants for the Inclusive Access Materials for that student and still other times, the student's spending account at their College is directly billed for the Inclusive Access Materials the day after the "drop/add" period ends (this is sometimes called "Immediate Access"). Defendants have developed and pushed this billing system to further prevent students from "opting out" of purchasing the Inclusive Access Materials.

54.    Defendants have developed and pushed agreements with Colleges that make Inclusive Access the default option for Course Materials. Having this captive market with little to no competition, the Publisher Defendants have continually sought to increase the number of Colleges, and classes at those Colleges, requiring the use of Inclusive Access Materials. The Publisher Defendants' goal is to move all Colleges and classes to 100 percent Inclusive Access Materials.

55.    The effect of Inclusive Access is to exclude any competition for Inclusive Access Materials by eliminating any other sources for students to purchase Inclusive Access Materials including the secondary market that typically exists for Course Materials.

56.    Inclusive Access has allowed the Defendants to slow or stop the decline in prices, revenue and profits that resulted from price competition.  Instead, as a result of their unlawful conspiracy to restrain trade, Defendants have been able stabilize, maintain and increase prices, revenue and profits through the growing number of courses that now require Inclusive Access Materials.

**E.    Agreements Among Defendants to Implement Inclusive Access.**

57.    By agreeing to move toward only selling Inclusive Access Materials, the Publisher Defendants collectively eliminated competition and used their market power to monopolize the relevant market(s). Then, by agreeing that, besides direct sales to students, the only sales of

Inclusive Access Materials would be to on-campus retailers, including the Retailer Defendants, they prevented other retailers from obtaining Inclusive Access Materials and restricted access to the relevant market(s).

58.     The Defendants' anticompetitive actions have created the ultimate captive market where all students must buy all new Inclusive Access Materials every semester and can only buy those materials from the Defendants.  The Publisher Defendants did not independently arrive at this decision to create a standardized and "new" market for Inclusive Access Materials. Senior executives of the Defendants frequently and privately communicated with one another in furtherance of the conspiracy. Their conversations included the joint mechanics of the Inclusive Access scheme, such as focusing on the classes that have the highest student enrollment and therefore the largest economic impact on the Publisher Defendants. They also discussed furtherance of their joint goal to eliminate the secondary market, monopolize the relevant markets, and boycott certain retailers.

59.     The Publisher Defendants entered into one or more horizontal agreements with each other to monopolize the relevant market(s), and to conduct a group boycott of, and concerted refusal to deal with, retailers other than the Retailer Defendants.

60.     The Publisher Defendants entered into agreements with Colleges that incentive the Colleges to convert as many classes as possible to Inclusive Access. For example, the agreements may require the College to maintain a certain percentage of students enrolled in classes using Inclusive Access Materials or lose offered "discounts" for those materials.

61.     The Publisher Defendants included the Retailer Defendants in their plan to hasten the move of as many classes from typical Course Materials to Inclusive Access Materials as possible. The Publishers used agreements, including exclusive dealing arrangements, with the

16

Retailer Defendants to promote an exclusive relationship and effectively make Inclusive Access Materials the only option. Through these agreements, the Publisher Defendants agreed not to sell Inclusive Access Materials to retailers other than the Retailer Defendants. As a result, the Retailer Defendants received the sales from students for those classes every semester, and shared the revenue from those sales with the Publisher Defendants.

62.     The agreements with Publisher Defendants were very profitable for the Retailer Defendants. Often, the Retailer Defendants are required, under agreements they have with the Colleges, to make payments to the College representing a percentage of gross sales. In some instances, these agreements provide for a lesser percentage to be paid for sales of electronic Course Materials (including Inclusive Access Materials) than they do for the sale of printed Court Materials.

63.     To further the conspiracy, the Retailer Defendants provided the Publisher Defendants with their full cooperation and participation in the conspiracy, including pushing Inclusive Access Materials at Colleges. Prior to the growth of Inclusive Access, the Retailer Defendants had an average capture rate of 35-40 percent of student purchases of Course Materials at a College. Their new arrangement effectively eliminated all substitute sources for Course Materials with respect to classes with Inclusive Access and any potential competition on price. Through the Retailer Defendants' agreement to join the Publisher Defendants in their scheme to move the market to Inclusive Access Materials, they secured themselves a position as the exclusive retail providers of Inclusive Access Materials.

**F.    Defendants' Conduct Has Harmed Competition, Resulted in Supra-Competitive Prices and Has No Pro-Competitive Justification.**

64.     The anticompetitive actions of the Defendants have had the effect of restraining, suppressing, and eliminating competition in the sale of Inclusive Access Materials. The

Defendants' conduct adversely affected competition and injured the Plaintiffs and the Proposed Class by: (i) reducing or eliminating the output of and access to Inclusive Access Materials; (ii) eliminating or significantly reducing price competition for Inclusive Access Materials; (iii) impeding or blocking the ability of actual or potential competitors to enter or expand sales in the relevant market; (iv) significantly raising barriers to entry for rivals; (v) reducing consumer choice among products and competing retailers; (vi) reducing quality and stifling innovation for Course Materials including Inclusive Access Materials; and (vii) artificially inflating the price of Inclusive Access Materials above competitive levels.

65.     Absent the Defendants' anticompetitive conduct and the substantial foreclosure and reduction of effective competition caused by such conduct, the Defendants would have faced additional competition.

66.     There are no legitimate pro-competitive justifications for the Defendants' conduct or any that outweigh the substantial anticompetitive effects of that conduct. Contrary to Defendants' representations, Inclusive Access does not represent any innovation, technological advancement, or cost savings to students. The Inclusive Access scheme is merely a limitation on access, which is not procompetitive and results in fewer choices and increased prices for student-consumers. The access limitation actually diminishes the student's experience and purchasing options. The access limitation also subtracts from competition in the marketplace, as other retailers have no ability to obtain or sell the Inclusive Access Materials.

**G.     Continuing Violation.**

67.     As detailed above, the Defendants have engaged in an ongoing conspiracy to restrain trade, including by eliminating competition, controlling the market, monopolizing the

market, raising pricing, and eliminating substitute products through repeated overt acts in furtherance of such conspiracy.

68.     Each sale of Inclusive Access Materials by the Publisher Defendants and/or Retailer Defendants is an act in furtherance of the conspiracy. Defendants' ongoing anticompetitive conduct has caused and continues to cause harm to Plaintiffs and members of the proposed Class including through payment of supra-competitive prices for Inclusive Access Materials.

69.     The Defendants' continued communications and advancement of the conspiracy, as evidenced by the continued operations of EPEG and continued communications in furtherance of the conspiracy are overt acts in furtherance of the ongoing conspiracy.

**H.     The Recent Investigation Revealed the Highly Concentrated Nature of the Industry.**

70.     The proposed merger between competitors Cengage and McGraw-Hill sparked an investigation of those companies. On July 1, 2019, the Department of Justice sent a second request for information to the companies, signaling further government investigation of that arrangement.

71.     Since then, on March 10, 2020, U.S. Representatives David Cicilline and Jan Shakowski wrote to the Department of Justice, requesting that it "closely scrutinize" the proposed merger. The letter pointed out the industry's "excessive level of consolidation." The letter also expressed concern that the "'inclusive access' model" may remove price-shopping and prevent textbook resales, "destroying the cost-lowering effect of the secondary textbook market."

72.     More recently, on April 24, 2020, six U.S. Senators wrote to the Department of Justice, sharing "serious concerns regarding the proposed merger." The letter pointed out the "highly consolidated nature of the textbook industry," the problem of "inclusive access," and "strong incentives to collude rather than compete" if the merger was completed.

73.     The United Kingdom's Competition & Markets Authority also investigated the Cengage and McGraw-Hill merger. On March 20, 2020, that agency announced it had referred the merger for a Phase 2 investigation. On April 1, 2020, the agency announced a three-week delay in its investigation "as the Parties were considering their next steps," including "whether to abandon the arrangements which are the subject of the reference." The agency said it "reasonably believes that the arrangements in question might be abandoned." Accordingly, it granted the delay. The companies' spokesperson said the request allowed them to focus on their "ongoing" discussions with the U.S. Department of Justice.

74.     On May 4, 2020, McGraw-Hill and Cengage announced they were abandoning the merger. Cengage cited prolonged regulatory review as well as inability to agree with the Department of Justice on a package of divestitures.

## VI.     RELEVANT MARKET

75.     Plaintiffs allege that Defendants' conduct was *per se* illegal: the Publisher Defendants and Retailer Defendants (1) colluded to establish and operate the Inclusive Access system in order to restrict the supply of Inclusive Access Materials and monopolize the market for Inclusive Access Materials so that they could raise prices, and (2) have effectively established a group boycott to prevent Inclusive Access Materials from being sold through any other sources. However, to the extent that Plaintiffs' claims must proceed under the rule of reason or otherwise require the definition of a relevant market, Plaintiffs set forth that relevant market here.

76.     The relevant product market for the purposes of the antitrust claims in this action is the market for Inclusive Access Materials (the "Inclusive Access Market").

77.     The Inclusive Access conspiracy by Defendants seeks to use Inclusive Access to eliminate competition from new and used Course Materials in printed form, electronic versions of Course Materials, and Course Materials in whatever form sold by other online and physical sellers.

78.     On information and belief, the Publisher Defendants have a market share of over 90 percent in the Inclusive Access Market.

79.     The Inclusive Access Market is a product market consisting only of Inclusive Access Materials. There are no substitutes for Inclusive Access Materials. The availability of other sources of new or used Course Materials does not constrain the price of Inclusive Access Materials because students are not allowed to purchase those Course Materials in place of the Inclusive Access Materials. Inclusive Access Materials can only be purchased directly from the Publisher Defendants or from official on-campus retailers, whether run by the Retailer Defendants or by a College itself.  Inclusive Access Materials are generally not available from any other source, or in the rare instances when they are, they are more expensive. Therefore, the isolated availability of Inclusive Access Materials from other sources does not constrain the supra-competitive prices charged by official on-campus retailers.

80.     At all relevant times, the Publisher Defendants had substantial market power in the Inclusive Access Market. The Publisher Defendants had the power to maintain the price of Inclusive Access materials at supra-competitive levels, and to do so profitably without losing substantial sales.

81.     The relevant geographic market is the United States. The relevant geographic submarkets are the markets for Inclusive Access Materials at each individual College. Students at one College cannot purchase Inclusive Access Materials from other Colleges, and generally cannot

purchase them from other sources at all other than the relevant Publisher Defendant or their own on-campus bookstore.

82.     Therefore, the official on-campus bookstore at each College has an effective total monopoly on the Inclusive Access Market for that College submarket.

83.     At all relevant times, the Retailer Defendants had substantial market power in the Inclusive Access Market at all Colleges in which they operate official on-campus bookstores. The Retailer Defendants had the power to maintain the price of Inclusive Access Materials on those campuses at supra-competitive levels, and to do so profitably without losing substantial sales.

84.     The Retailer Defendants have over a 50 percent market share in the percentage of official on-campus bookstores that they operate nationwide, and they serve nearly two-thirds of the nation's College students.  Accordingly, they control a dominant market share in the overall Inclusive Access Market.

85.     The Inclusive Access Market is susceptible to collusion due to the small number of dominant publishers, the monopoly position of on-campus bookstores, the captive market of students who are required to purchase the Inclusive Access Materials to pass their classes, and high barriers to entry due to, among other things, Publisher Defendants' and Retailer Defendants' longstanding relationships with textbook authors, professors assigning Course Materials, and Colleges.

86.     If the Defendants' actions are not enjoined, the Inclusive Access Market is likely to take over more and more of College Course Materials sales, resulting in higher prices and reduced choice for more students on more campuses and in more of their courses.

## VII.   CLASS ACTION ALLEGATIONS

87.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) seeking damages and

injunctive relief pursuant to federal antitrust law for the following class:

> All persons and entities who purchased Inclusive Access Materials directly from the Defendants for personal use in the United States during the Class Period.

> Specifically excluded from the Class are Defendants, their subsidiaries, parents, affiliates, joint ventures, and employees and co-conspirators; federal governmental entities and instrumentalities; states and their subdivisions, agencies, and instrumentalities; and any judge(s) or jurors assigned to this case.

88.     The Class Period is from January 1, 2016 until the effects of Defendants'

conspiracy end ("Class Period").

89.     Plaintiffs are direct purchasers from one or more of the Defendants.

90.     **Class Identity**:  The above-defined Class is readily identifiable and ascertainable

and a Class for which identifying records should exist.

91.     **Numerosity**:  Plaintiffs do not know the exact number of class members because

such information is presently in the exclusive control of Defendants, their co-conspirators, and

other entities. Plaintiffs believes that due to the nature of the trade and commerce involved, there

are thousands of class members geographically disbursed throughout the United States and that

joinder of all class members is impracticable.

92.     **Typicality**:  Plaintiffs' claims are typical of the claims of the members of the Class

because Plaintiffs purchased Inclusive Access Materials directly from one or more of the

Defendants for personal use. Therefore, Plaintiffs' claims arise from the same common course of

conduct giving rise to the claims of the Class and the relief sought is common to the Class.

93.     **Common Questions Predominate**:    Common questions of law and fact predominate, including, but not limited to:

(a)     Whether the Publisher Defendants and Retailer Defendants agreed to promote, implement and enforce the Inclusive Access system;

(b)     Whether the Publisher Defendants agreed among themselves to fix, raise, stabilize or maintain the price of Inclusive Access Materials;

(c)     Whether the Publisher Defendants conspired to unreasonably restrain trade by artificially limiting the ability of Plaintiffs and the Class to obtain Inclusive Access Material substitutes and by artificially reducing the supply of Inclusive Access Materials;

(d)     Whether the Publisher Defendants concertedly refused to deal with independent retailers;

(e)     Whether the Retailer Defendants conspired to fix, raise, stabilize, or maintain the price of Inclusive Access Materials under the Inclusive Access system;

(f)     Whether the Retailer Defendants conspired to unreasonably restrain trade by artificially limiting the ability of Plaintiffs and the Class to obtain Inclusive Access Material substitutes and by artificially reducing the supply of Inclusive Access Materials;

(g)     Whether Defendants engaged in an overarching conspiracy among themselves to fix, raise, maintain, or stabilize the price of Inclusive Access Materials, or to unreasonably restrain trade by artificially limiting the ability

of Plaintiffs and the Class to obtain Inclusive Access Material substitutes and by artificially reducing the supply of Inclusive Access Materials;

(h)     Whether Defendants engaged in exclusive dealings and other restrictive, exclusionary, unfair, and anticompetitive conduct;

(i)     The identity of the conspiracy's participants;

(j)     The duration and extent of the conspiracy alleged in this complaint and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

(k)     Whether the alleged conspiracies violated federal antitrust laws;

(l)     Whether the Defendants' conduct caused injury to the business or property of the Plaintiffs and other Class members;

(m)     The effect of the alleged conspiracies on capacity, supply, and access in the market for Inclusive Access Materials at Colleges;

(n)     The appropriate class-wide measure of damages; and

(o)     Whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

94.     These and other questions of law or fact, which are common to the members of the Class, predominate over any questions affecting only individual members of the Class.

95.     **Adequacy**:  Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interest is aligned with, and not antagonistic to, those of the other members of the Class who directly purchased Inclusive Access Materials from the Defendants. Plaintiffs have retained

counsel competent and experienced in prosecuting class actions and antitrust litigation to represent them and the Class.

96.     **Superiority**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged members of the Class is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law alleged in this complaint. Individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties than individual litigation and will provide the benefits of unitary adjudication, economy of scale, and comprehensive supervision by a single court.

97.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

98.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## VIII.  <u>ANTITRUST INJURY</u>

99.     The actions by Defendants have harmed Plaintiffs and members of the Class who attended institutions using Inclusive Access because it effectively forced Plaintiffs and Class Members to purchase Inclusive Access Materials directly from the Publisher Defendants and/or the Retailer Defendants at prices that were higher than they otherwise would be if those Inclusive

Access Materials were available in multiple formats and from multiple sources in a competitive market.

100.    Absent Defendants' conduct, Plaintiffs and Class members would have numerous alternatives when purchasing Course Materials. For instance, third-party retailers have traditionally offered new and used versions of Course Materials, as well as rental options. Third-party retailers even provided students the option to purchase electronic versions of the relevant Course Materials.  Students also have developed their own informal market for Course Materials, selling or exchanging prior course materials on websites like e-Bay, Facebook Marketplace, or Craigslist. Genuine competition between those alternative options and the Inclusive Access Market would lower prices for Course Materials.

101.    Consequently, Plaintiffs and Class Members have suffered antitrust injury as a result of Defendants' conduct.

## IX.    FRAUDULENT CONCEALMENT

102.    The Defendants concealed their conspiracy from Plaintiffs and other members of the Class. The Defendants' actions in developing and implementing the Inclusive Access conspiracy occurred in private communications, including through trade associations that claimed publicly to have other purposes. The Defendants' public statements promoted Inclusive Access to students and universities as being a technological advance, being cheaper, or being a response to consumer demand.  Defendants did not disclose that Inclusive Access was in fact part of a conspiracy they engineered to raise prices and increase profits by eliminating competition.

103.    Plaintiffs and other members of the Class did not have access to information that would have alerted them to the existence of the conspiracy between the Publisher Defendants and Retailer Defendants. A student who was instructed that the Course Materials for a certain course

would only be available as Inclusive Access Materials would not reasonably suspect that it was the result of a conspiracy to increase profits by eliminating competition at the students' expense.

104.    In light of the above, the Publisher Defendants and Retailer Defendants' knowing and active efforts to conceal the conspiracy and the conduct behind it should be deemed to toll any statute of limitations herein, and to estop Defendants from using any statute of limitations defense in this action.

## X.    CLAIMS FOR RELIEF

### COUNT I

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**
**CONSPIRACY IN RESTRAINT OF TRADE**

105.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

106.    Beginning at a time currently unknown to Plaintiffs, but at least as early as January 1, 2016, and continuing through the present, the Publisher Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially fix, raise, stabilize, and maintain the prices in the Inclusive Access Market, to end price competition, and to limit competition in the United States, including from other publishers, retailers, and used book sellers, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

107.    The Publisher Defendants colluded to restrain trade in Course Materials through the Inclusive Access conspiracy described herein by, among other things: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access, (2) arranging to have Colleges promote the purchase of Inclusive Access Materials by students, (3) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form, and (4) refusing to sell Inclusive Access Materials to retailers other than official

28

on-campus bookstores, including by imposing pretextual anticounterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for Inclusive Access Materials.

108.    The Retailer Defendants colluded to restrain trade in Course Materials at Colleges on which they operate official on-campus bookstores through the Inclusive Access conspiracy described herein by, among other things: (1) working with the Publisher Defendants and to impose Inclusive Access, (2) arranging to have Colleges promote the purchase of Inclusive Access Materials by students, and (3) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form, all with the intention of eliminating competition and raising prices by establishing a captive market for Inclusive Access Materials.

109.    As a result of the Publisher Defendants and Retailer Defendants' Inclusive Access conspiracy as described herein, Plaintiffs and other Class members have had to pay higher prices for Inclusive Access Materials as a result of the elimination of competition, and it has therefore caused them injury.

110.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT II

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2) MONOPOLIZATION

111.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

112.    In the Inclusive Access Market at each individual College that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at Colleges where they run the

official on-campus bookstore) have monopoly power that was willfully acquired through the conspiracy described herein rather than through any technological advantages from, or consumer demand for, Inclusive Access Materials.

113.    In the Inclusive Access Market at each individual College that uses Inclusive Access and at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants acquired their monopoly power through anticompetitive and exclusionary means including: (1) arranging to have Colleges promote the purchase of Inclusive Access Materials by students; (3) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form; and (3) the Publisher Defendants refusal to sell Inclusive Access Materials to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anticounterfeiting standards.

114.    In the Inclusive Access Market at each individual College that uses Inclusive Access and where the College runs the official on-campus bookstore, the Publisher Defendants acquired their monopoly power through anticompetitive and exclusionary means including: (1) arranging to have Colleges promote the purchase of Inclusive Access Materials by students; (2) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form; and (3) refusing to sell Inclusive Access Materials to retailers other than the official on-campus bookstore, including by imposing pretextual anti-counterfeiting standards.

115.    These actions by the Publisher Defendants and Retailer Defendants have served to create and maintain their monopoly in the Inclusive Access Market at each such College, in violation of 15 U.S.C. §2.

116.    The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for Inclusive Access Materials than they would pay in a competitive market.

117.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Ac.

## COUNT III

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)
### ATTEMPTED MONOPOLIZATION

118.    Plaintiffs repeats and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

119.    In the Inclusive Access Market at each individual College that uses Inclusive Access, the Publisher Defendants (and the Retailer Defendants at Colleges where they run the official on-campus bookstore) engaged in predatory and anticompetitive conduct with the specific intent of monopolizing that market, and with a dangerous probability of monopolizing that market.

120.    In the Inclusive Access Market at each individual College that uses Inclusive Access and at which a Retailer Defendant runs the official on-campus bookstore, the Publisher Defendants and Retailer Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have Colleges promote the purchase of Inclusive Access Materials by students; (2) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form; and (3) the Publisher Defendants refusing to sell Inclusive Access Materials to retailers other than the official on-campus bookstore run by the Retailer Defendant, including by imposing pretextual anticounterfeiting standards.

31

121.    In the Inclusive Access Market at each individual College that uses Inclusive Access and at which the College runs the official on-campus bookstore, the Publisher Defendants engaged in the following anticompetitive and exclusionary conduct with the specific intent of monopolizing the market: (1) arranging to have Colleges promote the purchase of Inclusive Access Materials by students; (2) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form; and (3) refusing to sell Inclusive Access Materials to retailers other than the official on-campus bookstore, including by imposing pretextual anticounterfeiting standards.

122.    There is a dangerous probability that the Publisher Defendants' conduct will in fact monopolize the market for Inclusive Access Materials at Colleges that use Inclusive Access, and that the Retailer Defendants' conduct will in fact monopolize the market for Inclusive Access Materials at the Colleges at which they operate the official on-campus bookstores, since through these policies they have excluded all other possible competition from that market.

123.    These actions by the Publisher Defendants (and Retailer Defendants where applicable) constitutes "attempted monopolization" of the Inclusive Access Market at each such College, in violation of 15 U.S.C. §2.

124.    The Publisher Defendants and Retailer Defendants' violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for Inclusive Access Materials than they would pay in a competitive market.

125.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act.

## COUNT IV

**VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)**
**CONSPIRACY TO MONOPOLIZE**

126.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

127.    The Publisher Defendants colluded to restrain trade in Inclusive Access Materials through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the Inclusive Access Market by, among other things: (1) working with the Retailer Defendants and college-run bookstores to impose Inclusive Access; (2) arranging to have Colleges promote the purchase of Inclusive Access Materials by students; (3) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere or in a different form; and (4) refusing to sell Inclusive Access Materials to retailers other than the official on-campus bookstores, including by imposing pretextual anticounterfeiting standards, all with the intention of eliminating competition and raising prices by establishing a captive market for Inclusive Access Materials.

128.    The Retailer Defendants colluded to restrain trade in Inclusive Access Materials at Colleges where they operate official on-campus bookstores through the Inclusive Access conspiracy described herein, with the specific intent to monopolize the market for Inclusive Access Materials at those Colleges by: (1) working with the Publisher Defendants to impose Inclusive Access; (2) arranging to have Colleges promote the purchase of Inclusive Access Materials by students; and (3) making it impossible for students in Inclusive Access courses to obtain Inclusive Access Materials elsewhere, all with the intention of eliminating competition and raising prices by establishing and exploiting a captive market for Inclusive Access Materials.

129.    The Publisher Defendants and Retailer Defendants committed overt acts in furtherance of the conspiracy alleged herein, including entering into exclusivity agreements between Publisher Defendants, Retailer Defendants, and Colleges, between Publisher Defendants and Retailer Defendants, and between Publisher Defendants and Colleges.

130.    These actions by the Publisher Defendants (and Retailer Defendants where applicable) are a conspiracy to monopolize the Inclusive Access Market at each such College, in violation of 15 U.S.C. §2.

131.    The Publisher Defendants and Retailer Defendants' conspiracy to monopolize the Inclusive Access Market at each such College in violation of 15 U.S.C. §2 has caused injury to Plaintiffs and other Class members by forcing them to pay higher prices for Inclusive Access Materials than they would pay in a competitive market.

132.    Plaintiffs and the Class also seek an injunction against Defendants, preventing and restraining the violations alleged above, under § 16 of the Clayton Act

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows.

1.    The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs to serve as Class Representatives and their counsel of record to serve as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

2.    The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed in violation of Sections 1 and 2 of the Sherman Act;

34

3.      Plaintiffs and the Class recover damages, with joint and several judgments in favor of Plaintiffs and the members of the Class entered against Defendants in an amount to be trebled to the extent the law permits;

4.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose of effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the sharing of highly sensitive competitive information that permits individual identification of the competitor's information or facilitates exclusion of competitors;

6.      Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, with such interest at the highest legal rate from and after the date of service of this Complaint;

7.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

8.      Plaintiffs and the members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all issues so triable.


Dated:  July 23, 2020                               Respectfully submitted,

                                                  /s/ Keith J. Verrier
                                                 Keith J. Verrier
                                                 Austin B. Cohen
                                                 **LEVIN SEDRAN & BERMAN LLP**
                                                 510 Walnut Street, Suite 500
                                                 Philadelphia, PA 19106-3997
                                                 Telephone: (215) 592-1500
                                                 Facsimile: (215) 592-4663
                                                 kverrier@lfsblaw.com
                                                 acohen@lfsblaw.com

                                                 *Counsel for Plaintiffs and the Proposed Class*

36